The next case scheduled for argument this morning is U.S. v. Olivera & Lopez, 18-2040, 18-2077. Good morning, Your Honors, and may it please the Court. You know, if you would like, you could raise the podium. There's a button on your – yeah, right. I think I'm – You think it's high enough? High as it can go, Your Honor, so I'll lean down a little bit. Your Honor, I represent Judy Olivera on this appeal, and I think I will limit my argument today to two issues, the first being the first issue in our brief as to the admission of testimony under Section – or under Rule of Evidence 804b3, and the second being the sentencing issue. Like my colleague in the prior case, I will not raise the Hobbs Act issues, which has already been decided against me. It's our view, as stated in our brief, that non-inculpatory statements were admitted in the testimony of cooperating witness Fernandez. Ms. Olivera was on trial with her co-defendant, Mr. Lopez. He allegedly made a series of statements about the robbery at issue in this case, and those were testified to at trial. We went through, at some length, a number of statements in our brief which we don't believe were inculpatory and where, I think, as required by SAGIT, the district court did not do a granular finding as to each statement. How did you bring this to the district court's attention? Did you try to go through with her on a statement-by-statement or sentence-by-sentence basis the expected testimony, or how did this interaction happen? Well, the trial attorney filed a motion in Lemonet, and a hearing was held on that. And his attack was on all of the statements. So he didn't ask the judge for a statement-by-statement ruling as to whether each was inculpatory sufficiently or, you know, otherwise met the rule? He did not argue it in that way. That's correct. But ultimately, the statements were, you know, all of the statements were presented to and challenged at the hearing. And the judge's findings are on pages 178 through 180 of the first volume of our appendix. And they simply don't go through statement-by-statement as to why each one. What I'm trying to understand is whether it was presented to the judge in that way. I mean, I saw her response, and she analyzes the inculpatory nature of the statements kind of generally as this relatively brief testimony, but doesn't do it on a sentence-by-sentence basis. And your brief does in a very granular way, but it wasn't clear to me that the trial counsel presented the objections to the statements in such a granular way to give the district court an opportunity to rule on them in that way. It's interesting, Your Honor, he did not yet. The statements were laid out in some detail by the government. And the statements, it's not as if the nature of each statement wasn't presented in a way that invited the judge to make a finding. As to each statement individually? Yes. I think as to the statements individually, the government laid it out in their memo for the in limine hearing fairly, in a fairly detailed way. Would you point me to that? Point us to that, please? I'll have to. Is it in the record? It is in the record. There are memos in the docket. I do not believe I included their memo in our joint appendix, but I can follow up with a letter with the docket number. That would be helpful.  And, you know, I thought they did a creditable job of really laying things out in a very detailed way, which, you know, given that the law at the time was very well settled, that one has to make the sort of granular findings that we talk about in the brief, the judge should have done that and did not do so. And, you know, we also take issue, I think, with some of the specific findings she did make, including a finding that people involved in criminal activity together normally are truthful with each other, which I think is something that is generally unsupported, and I think should not be, does not come to the attention of the court to constitute really any basis for finding that the statements were inculpatory. So the statements are laid out in some detail in the brief. I won't go through them one by one, but I will say that on the whole they required the individualized findings, which we did not receive in this case. And if we agree with you that it would have been better practice for the district court to go through more granularly, even absent such a presentation of objections by counsel, could we find that it was harmless error, nonetheless, to have made that ruling? I argue that it's not simply because, Your Honor, we had really two major witnesses here. A third co-conspirator, Mr. Monge, testified. And then there was the witness testimony from the cooperating witness, Mr. Fernandez, about the statements that were made to him by Lopez. And, you know, both Monge and Fernandez had lengthy and significant criminal records. Fernandez was testifying under a grant of immunity, and as always, any witness testifying under a grant of immunity's testimony has to be looked at with special care. And so this testimony that came in under 804b3 did add quite a bit, in my view, to the government's case. And I think in that — in the context here, it would not be appropriate to find that it was harmless. We also argue that in any event, even for those statements where the court would find that they were, in fact, inculpatory, that they were not reliable, and that the reliability is the second prong of 804b3. I'd also note that we — there was an 803 — or a 403 objection backing up all of this. And for the 403 objection, I think one can look at the motive of the witness, Mr. Fernandez. He was immunized, and he had substantial motive to fabricate, and he also was very concerned about his potential liability at that point. The other issue I want to touch on is the sentence, and that we believe it was — a 40-year sentence was substantively unreasonable. And I think in this case, under the Section 3553A factors, in particular A6, the defendant prescribes unwarranted sentencing disparities. Sotomayor, is this a guideline sentence? It is a guideline. It's within the guideline range. And it was — What was the guideline range? The guideline range was life. And the two counts were each 20-year counts. And so sentenced consecutively, 40 years was the maximum that the defendant could receive. Now, although it was a guideline sentence, the Court — this Court has held that the fact that it was a guideline sentence doesn't preclude analysis for a substantive disparity. And just very briefly, there was no premeditation, and this is on page 447 of our appendix, the district court's findings. Oliveira was not engaged. She did not engage in the violence. In terms of no premeditation, I think the district court said she believed they didn't go there intending to kill. But that wasn't excluded from the range of possibilities. Her violence wasn't excluded from the range of possibilities by any agreement, was it? Does the record — No, you're correct, Your Honor. It would not be excluded from the range of possibilities. But their plan — People usually don't pay social calls with a hammer and a mallet. Which gets to my final point, Judge Jacobs, which is my client did not know about the hammer and the mallet. There's nothing in the record. And I'd point to pages 179 to 183 of the trial transcript. I thought she did. But we'll find out. We'll hear more. Thank you very much. You have a minute of rebuttal. We'll hear from Ms. Feldman. Good morning, Your Honors. Marcia Feldman for the appellant, Gibran Lopez. Your Honors, the erroneous introduction of uncharged crimes evidence both singularly and cumulatively deprived the defendant of his right to due process and a fair trial. The government here argues with respect to the cooperating witness, Fernandez, that Fernandez's role as a longtime or prior drug supplier in the years before 2012 provided the context necessary to understand why Lopez trusted Fernandez. But the fact that they had this drug relationship, or maybe they did or maybe they didn't, back before 2012 really was something that was unnecessarily presented and its prejudicial impact on this case certainly outweighed its probative value. There is no question that the government could have presented. That's a very tough standard of review for us as to whether the prejudice outweighed the probative value. I understand that, Your Honors. It's hard. But certainly the government could have presented that the two parties had a longstanding relationship. They knew each other in college. But the fact that they had to or wanted to present that there was a drug-dealing relationship was unnecessary. Fernandez and Lopez were not co-conspirators in the Klein-Hobbs robbery. They were the allegation was that they were somehow planning a fake sting robbery at a later time, all of which was put together by the government to try to lure Lopez into making certain statements to Fernandez. That's not government misconduct. It happens pretty often. It does. It does. I understand that, Your Honor. Didn't Mr. Fernandez's testimony also about the drug debt owed to him because of their prior dealings provide a possible motive for the robbery? No, Your Honor, because the ‑‑ I don't know that that was really the motive based on the record that was presented. There was no indication. Well, we don't know. But I thought when he repaid the money, he explained it was from the robbery and he did have a debt, having received a supply and not having paid for it, I thought. Am I incorrect? He didn't indicate that. The record does not state that he told Fernandez he was paying him back from the Klein robbery. No, but ‑‑ He said there was a lick. It was a prior lick. Plus, the math doesn't add up. He owed him $350, and according to the record, they split $88. Well, just because they found less than they expected possibly doesn't mean that they weren't related. But the issue is that the government was trying to imply that the $350 that was paid came from the Klein robbery. There's no real evidence as to that. It's simply an inference based on an inference based on an inference. The fact that he says there was a lick, we don't know what he's referring to the Klein robbery. Was it clear from the testimony that a lick meant a robbery? We're not disputing that. But I'm not necessarily indicating it was the Klein robbery. He doesn't indicate it was a lick three months ago. There's no timeline. There's no where the lick occurred or anything. It was just in their conversation. In addition, the fact that the government also presented evidence with respect to Manj's and Lopez's prior drug dealings was also more prejudicial than probative. Manj and Lopez lived together. That was the nature of their relationship. There was absolutely no evidence that they jointly sold drugs. In fact, they didn't jointly sell drugs. They were in – I believe Manj was a member of the Latin Kings and he was living there, but there was absolutely no prior criminal relationship between Manj and Lopez. Obviously, we have the relationship that occurred during the alleged crime. As counsel pointed out, both Fernandez and Manj are compromised witnesses. Fernandez testified under an immunity agreement and Manj testified pursuant to a cooperation agreement. So these were not reliable witnesses. And the information regarding Fernandez's drug – prior drug selling criminal activity was really not offered for a proper purpose. It was not relevant or material to the issues that were in dispute in this case. And as I indicated, the probative value substantially outweighed the prejudicial effect. The statements were not necessary to explain the defendant's statements to Fernandez or place those statements to Fernandez in any kind of context. And there was – the evidence of the sting robbery, I think, was interesting primarily because it was concocted. It was a concocted crime, and I understand that the Court's position on that. But the judge's determination that somehow there was – this showed some kind of modus operandi was also, in my – in our view, questionable. A modus operandi is when you share some characteristic. There was no sharing of a characteristic between the prior drug dealing or the sting robbery and what occurred in the Klein-Hobbs robbery. So certainly I don't believe that there was a modus operandi that was operating here to show that that evidence should have been admitted. I will – I have set forth some time for rebuttal unless the Court has further questions. Thank you very much. Thank you. We'll hear from the government. Good morning. Good morning. May it please the Court. My name is Christopher DeMacy. I represent the government in this appeal, and I also represented the United States in the proceedings below in district court. There is no basis to reverse the convictions of Mr. Lopez and Ms. Oliveira below or to disturb the district court's sentence on Ms. Oliveira. The district court properly admitted evidence of Lopez's prior drug dealing and the trial, and likewise properly admitted statements against penal interest against both of the two defendants. Could you address the statement against penal interest, please? Yes. And looking back at Williamson and looking at our February 2019 decision in – I don't know how to pronounce it – Ojudan, we seem to be looking for a level of specificity and granular review that carefully calibrates whether the statement was actually against penal interest and whether it was corroborated, whether it was reliable, and we do so in a statement-by-statement way. And that's what Williamson seems to emphasize, particularity. I gather here that the defense counsel didn't exactly ask for that. But it wasn't incumbent on the district court to conduct a more detailed analysis because these were – you can read the testimony with the challenge statements whited out, and it still makes sense. It's not that they were necessary to the flow of the narrative. Otherwise, the jury would be puzzled. So could you address that concern? Of course. And so a couple of points. First, I think looking at the way this was presented to the court, in fact, the government moved in limine and laid out these sentences one by one in discrete portions so that they were available for the district court to review. And actually, at the final pretrial conference, when this issue was litigated and there was some briefing, obviously, in response to the government's motion in limine, the court did actually go through the statements. The portion of the transcript where that happens is relatively short, but there is a statement-by-statement discussion with the government about how the – what the government's position is. Would you point me to where in the record that is, please? Yes, Your Honor. I'd be happy to do that. Let me just – that's at appendix 125 to 126, at the bottom of 125 and to the top of page 126. And basically what happened at the final pretrial conference is the judge went through two different sets of statements against penal interest. There were some statements made to an inmate who wound up not testifying at the hearing, and then there were also these statements made to Mr. Fernandez that were laid out on a statement-by-statement basis. And, you know, could the judge have gone into more detail on each statement? Sure. But there is evidence here that the judge is parsing them out, looking at them one at a time. They've been presented to Judge Vail in that manner. And at the end, obviously, rather than ruling on each statement individually, the judge does decide to rule on them as a group, but I don't think there's any legal issue with that. The fact is she had considered them all, and she knows what the law is regarding the fact that they must be against penal interest, in other words, inculpatory, and they must be reliable in some way. So why, for example, the statement that Judy opened the door, or that's what the plan was, that she was going to open the door, why was that against his penal interest? I think that was very clearly against his penal interest because that is a critical detail of how the charged robbery was to take place, and in fact, exactly how it did take place. So the law is very clear with regard to inculpatory statements. The statement doesn't need to subject you to immediate prosecution or on its own make you guilty, as long as it would be probative in a trial against you on that criminal offense. And there's no doubt that saying that your co-conspirator was going to gain access to the victim's apartment in a robbery is very probative evidence in the trial. And to the extent that some of these statements are less directly related to the offense, they still very clearly laid out the relationship between the parties, the relationship between Ms. Oliveira and the victim of the crime, the relationship between Mr. Lopez and his co-conspirator, Ms. Oliveira, all of which were also, in light of all the circumstances of this case, very probative evidence against Mr. Lopez, and therefore clearly inculpatory under the rule. And to add to that, I mean, I don't think it's worth dwelling on the reliability issue too long, but these were not statements made to law enforcement. These were statements made to an ally, you know, not in the context of a post-arrest statement. And they were very well corroborated by the other evidence in the case, which leads me to the last point, which is harmlessness. It's just simply not the case that this was such critical evidence that had it fallen away, Ms. Oliveira wouldn't have been convicted anyway. There was a surveillance video. There was the other witness who testified about her involvement, a co-conspirator in the crime. There were call records showing that Ms. Oliveira was one of the very last people in touch with the victim. There was her own statement to law enforcement that she made where she changed her story about whether she went there. And there were recorded prison calls with Mr. Lopez in which they talked about the victim. So there was overwhelming evidence aside from these statements. And so even if the judge did abuse her discretion here, it was harmless error. But turning to a different issue that Judge Jacobs mentioned, so what is the record evidence that Ms. Lopez knew that a wrench or a mallet or other tools associated with the assault was going to be brought? Yeah, and I think this also goes to the sentencing aspect of the appeal. Yes. I mean, there isn't any particular testimony from Mr. Monge that Ms. Oliveira herself saw the two weapons. But this was all happening in her apartment. The testimony was clear that she was there while it was happening, that not only did they gather these weapons up at the apartment, but they all traveled together to the victim's apartment. And so it was a very reasonable inference to be drawn by the judge based on that testimony. But to add to that, when the robbery was actually taking place and these two men came into the apartment, it's not as if Ms. Oliveira was gone. She was right there and walked by them as they were beating Mr. Klein to death with those very weapons. And she did not intercede. She did not attempt to stop the beating. In fact, she continued her participation in the robbery by grabbing a safe, putting it in a bag, walking out right by this brutal, brutal beating that led to Mr. Klein's death. Well, it would take a remarkable person to walk up to people who were beating someone to death and say, I don't really approve of this. You should stop. The question, I mean, this is a 40-year sentence. The question is what reasonable basis there was for assuming that she knew that they were going to use weapons that could easily be lethal. And that's a different question. I agree, Your Honor. I mean, to the point of the use of weapons and knowledge, robberies inherently involve the violence. I mean, the plan was to tie him up, so it's not as if they had some nonviolent plan to begin with. And they go with these weapons. The real critical thing here is she is not some passive participant. She is the mastermind of this robbery. Without her, it would never have happened. She knew the victim. She set it up. She let them in. She, I believe the evidence supports, knew that they would use these weapons if needed. She knew where the safe was, and she took the money. And she walked right by these two people. And I do think that here she has a personal relationship with the victim and a very close personal relationship with the two other co-conspirators. I don't think it would have been impossible for her to say something on her way by, to say, that's enough. I mean, this is unnecessary. Let's go. That is not outside the realm of possibility. But more to the point, after they leave, she says, she expresses no remorse. She said he deserved it. And she repeatedly makes efforts to avoid prosecution by lying to law enforcement. And she has been denied prosecution for weeks when they finally start looking for her on this crime. So there was plenty of record evidence on which the judge based her determination that a guideline sentence of 40 years in light of her substantial role and the seriousness of this crime, the grave seriousness of the crime, was merited in this case. Unless the court has any other questions at this point, the government would rest on its briefs. Thank you. Thank you. Mr. Levchuk, you have a minute rebuttal. Thank you, Your Honor. And I misspoke in response to your question. I did include the government's motion in Lemonet. The portions about the statement against penal interest are on pages, runs through A45 through A50 of the appendix. And so the statements were there for the judge to go through. And I think the Ojedon case, which Your Honor mentioned, is critical to this Court's finding on this. And I have to focus. In the end, whatever you say about the evidence, it was based on two very compromised witnesses, for which one always has to be very careful. And beyond those, if those two witnesses aren't believed, or if Mr. Monge isn't believed, she doesn't get convicted, regardless of anything else. I would also say that that's why it's not harmless. And in terms of her duty, in terms of premeditation, if she didn't know those weapons were in there, that is a — and the evidence is clear to me that she didn't — that is a clearly erroneous finding. She doesn't deserve the 40 years that the guy who hammered Mr. Kline does. And when you compare it to the 72-month sentence that the cooperator got, it's very stark for a woman who has no prior criminal history. Thank you. Kagan.  Ms. Feldman. Ms. Feldman. Ms. Feldman. All right. Thank you very much. Thank you both. We'll take the matter under advisement.